## THE NICANOR.

British & Foreign Marine Ins. Co., Limited, *v.* The Nicanor. New York Mut. Ins. Co. *v.* Same. Phipps *et al. v.* Same. Universal Marine Ins. Co. *v.* Same.

(*District Court, S. D. New York.* October 24, 1889.)

**1.** Payments—Voluntary Payments.

Payments voluntarily made cannot be recovered back upon grounds which would have constituted a defense, and were known to the plaintiff at the time of payment.

**2.** Shipping—Average Bond—Voluntary Payments.

The bark N., having stranded on the Jersey coast, was got off by a wrecking company, whose salvage was fixed by a board of underwriters at $15,000. The

ship's agents, at the master's request, paid the salvors, and the ship afterwards delivered the cargo to the consignees upon their executing an average bond to the ship's agents, describing them as "agents or owners of the vessel," and conditioned to pay them such sums as should be found to be a charge upon the goods. A general average adjustment was afterwards made, and the libelants, as insurers of several of the cargo owners, paid most of the amount charged against them by the adjusters; objecting, however, to any commissions, on the ground that the agents had no authority to advance money on their account. A few days afterwards, the same insurers filed libels to recover back the moneys paid, on the ground that the stranding was caused by negligent navigation: the facts constituting the alleged negligence being known to the libelants a considerable time before their payments were made. *Held*, that the ship's agents having advanced the money to pay the salvage in their capacity as the agents and representatives of the ship and her owners, and having taken the bond in that capacity, if the stranding was by negligence, such negligence was a defense against any claim upon the average bond, and that the payments made by the libelants, having been made with knowledge of the facts, were voluntary payments, and could not be recovered back.

In Admiralty.    Actions to recover for moneys paid for salvage of cargo.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for libelants.

*Wing, Shoudy & Putnam*, for claimants.

BROWN, J.    The above four libels were filed on October 10 and 11, 1889, by the insurers of different portions of the cargo on board the barkentine Nicanor, to recover from the ship the several amounts which the insurers had paid, or, as alleged, were liable to pay, on account of their insured cargo owners, for their proportion of salvage with which the cargo had become chargeable in consequence of the stranding of the Nicanor upon the Jersey coast on the 2d of September, 1889, it being alleged that the stranding occurred solely by the negligence of the vessel. The answers, filed on October 12th, deny the material allegations of the complaint; and the defense, in brief, was—*First*. That there was no negligence, and that the stranding arose from the effect of an unknown temporary inshore current, caused by previous north-east winds, afterwards hauling to the southward; and also by a single white electric light at the Longport Hotel, on the beach, being mistaken for the fixed white light at Absecom, a few miles to the northward: *Second*. That the claims of the salvors had been paid and discharged by the ship through advances from her agents; that the payments made by the libelants were made to these agents after the delivery of the cargo to the owners, on the execution of the usual average bond; and that such payments were made voluntarily, with full knowledge of all the facts, in partial settlement of that demand; and that no action, under such circumstances, would lie to recover back moneys thus voluntarily paid, even if the stranding was caused by negligence.

The vessel having been arrested by the marshal, and being in custody, the causes were brought to an immediate hearing.    On the trial, it appearing that no payment on account of salvage had been made by the second libelant above named, the New York Mutual, that action was discontinued.    The causes have been submitted on the proofs taken in the other three cases.

From the pleadings and proofs it appears that the Nicanor, loaded chiefly with hides and wool, bound from Montevideo to New York,

pursued the usual course up the coast, until about 3 P. M. on September 1, 1889, when she made the Five Fathom Bank light-ship on her port bow off the Delaware coast. The wind being north-easterly and variable, she continued on her starboard tack towards the shore, heading about N. N. W., until she made the land, at 7 P. M., having run in between Five Fathom Bank light-ship and the Northeast End light-ship. At 7 P. M. she tacked off shore. At 9, having the Northeast End light-ship nearly ahead, about half a point on her port bow, and half a mile distant, and the wind hauling towards the south-east, she again came about upon her starboard tack, and was put upon a north-east course, having the wind about half a point free. According to the testimony of her master, first and second mates, and her wheelsman, she continued on that course, heading north-east, until, at half past 1 on the morning of September 2d, she brought up on the beach to the northward of the entrance of Great Egg Harbor, and about six miles south-west of Absecom light. The point where she stranded is about twenty miles north by east from the Northeast End light-ship, so that the ship's actual course must have been about three points to the northward of her alleged heading, and about eight miles to the westward of a straight N. E. course from the light-ship. The wind was moderate, the weather fair, but somewhat hazy and smoky in the evening, particularly towards the land, and by midnight became thick. Assistance was procured from the Atlantic & Gulf Wrecking Company of Philadelphia, and the vessel floated on the following day. On September 4th she arrived at New York without damage to the cargo.

The master had made an agreement with the representative of the wrecking company to pay such salvage as should be fixed by the New York Board of Underwriters. On September 6th the matter was heard by that board, and on the same day $15,000 awarded in full for salvage compensation. The libelants had knowledge of the agreement, and, by their representatives, attended the hearing before the board, and acquiesced in its decision. On the same day, J. F. Whitney & Co., the consignees and agents of the ship in this port, upon the master's request and order, paid to the wrecking company the full amount of the award, and took its receipt in full to themselves as "agents of the bark Nicanor." Within a few days thereafter they procured the signatures of the various consignees of cargo to an average bond, in the usual form, which recites the stranding of the vessel, and the assistance rendered by the wrecking company ; and thereupon the cargo owners "covenant severally with J. F. Whitney & Co., owners, or agents of the owners, of said vessel, that the losses and expenses, or so much thereof as, upon an adjustment by Currie & Whitney according to the laws and usages of this port, should be a charge upon the cargo, should be paid to Whitney & Co., upon notice of the adjustment." Within the following two weeks the cargo was all discharged, and delivered to the consignees. The average adjustment was completed on October 4th, and notice thereof was at once given to the libelants. In the general average there was included, in addition to the salvage award, $1,261.24 for ropes and sheaves of the vessel, for

her disbursements in procuring the salvors, for protest, survey, and adjusters' expenses, and agents' commissions for advancing and collecting, and interest. The amount apportioned and charged against the first-named libelants, as insurers of cargo, was $3,491; against the second named, $976.50; against Phipps and others, $2,527; and against the Universal Marine Insurance Company, $2,514.50. Prior thereto, and about September 14th, at the request of the companies, a preliminary statement was sent them by the adjusters, showing the approximate amount of their shares in the adjustment; and before that, and as early as the 11th, the Universal and British & Foreign Companies were informed, through their attorney, Mr. Lawson, (letter of September 17th,) that J. F. Whitney & Co. had "settled with the salvor, and paid for their account the amount owed." On September 20th the Universal inclosed to J. F. Whitney & Co. its check for $2,500, as its approximate proportion of the salvage award; refusing, however, to recognize any claim for advancing or collecting, on the ground that J. F. Whitney & Co. "were not authorized to pay the amount owed on account of the salvage award." The British & Foreign Company, by letter of September 14th to J. F. Whitney & Co., stated its readiness to advance its share of the salvage contribution, but refused to recognize any claim for commissions or advancing; and on October 4th that company sent to the average adjusters its check for $3,250 "on account of the amount due for salvage award," which was transmitted on the same day to J. F. Whitney & Co. On the 5th October, Phipps and others also sent to J. F. Whitney & Co., "agents of the bark Nicanor," a check for $2,300 as a "payment on account of the sum owed by them for salvage claim," with the statement: "When we have had time to examine the account and adjustment, whatever balance is due will be paid to you." A few days afterwards, as above stated, the foregoing libels were filed to recover back the moneys thus paid.

As respects the master's negligence as the cause of the stranding, the case is by no means free from difficulty. It is not necessary, however, to consider that branch of the case, because I am satisfied that the libelant's claims are brought within that class of voluntary pa - ments in which suits to recover back the moneys paid are not allowed. The rule is well settled that the payment of a money demand, made voluntarily, and with knowledge of the facts, and not in consequence of any fraud, misrepresentation, or mistake, nor under any duress or oppression of person or property, is binding, and cannot be recovered back. A known defense, in such cases, must be made before payment, and even a protest will be of no avail. *Radich* v. *Hutchins*, 95 U. S. 213; *Mariposa Co.* v. *Bowman*, Deady, 228; *Glass Co.* v. *City of Boston*, 4 Metc. 187; *Flower* v. *Lance*, 59 N. Y. 603, 610; *Quincey* v. *White*, 63 N. Y. 370, 376.

The present case is not within any of the exceptions to the general rule. The libelants, at the time of their payments, had knowledge of all the material facts. The master's statement before the board of underwriters, at which the libelants were represented, was, in substance,

the same as on the present trial; and no additional evidence of negligence now appears. It was from two to four weeks after the award that the libelants' payments were made. During this interval there was ample opportunity for them to determine whether to seek to hold the ship liable for negligence or not. After this opportunity, they voluntarily transmitted their checks to the ship's agents in payment and settlement, *pro tanto*, of the claim for salvage contribution, even without any formal demand.

The rule cited has, of course, no application to independent demands that may be counter-claimed or offset or recouped against each other; such as a claim for freight by the ship, on the one side, and a counter-claim for damage to the cargo by the ship's negligence, on the other. In such cases, each party has his option as to the time and mode of litigating his demand. Here there were no such independent demands or causes of action at the time the payments were made.

The libelants urge that their causes of action are essentially for damages on account of the negligence of the ship in stranding, which imposed upon the cargo owners an obligation to pay their contributory shares of the salvage. But there was no physical damage to the cargo. The only damage to the cargo owners was a possible liability to pay a salvage contribution. As respects the right to recover in this action, that liability is to be judged, not according to what might have happened as a consequence of the stranding, but according to the circumstances as they actually existed at the time when the payments were made, viz., from September 25th to October 5th. If, at that time, the cargo owners were under no legal liability to pay any salvage contribution, as I find the fact to be if the stranding arose through negligence, then there was no legal damage, and the payments would be voluntary, in the legal sense, and cannot be recovered back.

There is no question that the wrecking company, in the absence of any other agreement, might have held the vessel and cargo, either in their own possession, or under arrest by suit *in rem*, until the ship and cargo owners had either paid or secured their respective shares; and on such payments the amounts paid could doubtless have been recovered back from the ship, if the stranding was caused by her negligence. But the circumstances here are quite different. Before the salvage service was begun, the master, on September 2d, agreed with the wrecking company that the latter should "assist the vessel now in distress, and leave the amount of compensation to the New York Board of Underwriters, binding himself and owners to abide by said award." The wrecking company relied upon this agreement. No person in its behalf accompanied the vessel beyond quarantine; no possession of vessel or cargo was maintained; no salvage suit was instituted; and, two days after arrival, the master performed his agreement by paying the salvors in full, through the ship's agents, who, upon his order and request, advanced the money therefor. Thereupon the ship had a lien upon the cargo for such contributory shares as, under the facts of the case, the cargo owners might be bound to pay, if anything; and, if the ship had required payment of

such shares before delivery of the cargo, the owners could have recovered back the sums paid in order to obtain their goods, upon proof that the stranding was by negligence. But there was no such detention of the cargo. It was delivered upon the execution of the usual average bond. Any possible lien upon the goods was thereby discharged; and thereafter the only existing claim against the cargo owners was a money demand, according to the terms of the bond, for such sums, when adjusted by Currie and Whitney, as "might be shown to be a charge upon the cargo." If, as the libelants allege, the stranding was caused by negligence, then no "charge upon the cargo" existed in favor of the ship, or of her owners, representatives, or agents, for any contribution towards the salvage award that she or they had paid. Such negligence would have been a perfect defense to any action which the master, owners, or ship's agents might have brought, either against the goods *in rem*, before delivery, or against the owners *in personam* upon the average bond. Gourl. Gen. Av. 15; *Snow* v. *Perkins*, 39 Fed. Rep. 334; *The Ontario*, 37 Fed. Rep. 222, *et infra*. The general intent of the bond is to stand as a substitute for the goods; not to commit the cargo owners to the payment of the sum adjusted, whether justly owing or not. The bond is not to be construed as a submission to arbitration before the adjusters; much less to preclude the cargo owners from any legal defenses against the payment of the salvage apportionment, wholly or in part. It was perfectly competent for them to show that, by reason of the ship's negligence, neither the ship owners nor her agents could recover anything on the bond. *The Niagara*, 21 How. 9; *The Alpin*, 23 Fed. Rep. 815, 819; *L'Amerique*, 35 Fed. Rep. 835, 837. As the facts constituting the alleged defense were known before the payment, the libelants were bound to avail themselves of this defense at the time; and, having paid without any duress or constraint, are barred from a subsequent recovery back.

I cannot sustain the contention that J. F. Whitney & Co. stand as independent assignees of the salvors' lien. There was no such assignment. Their payment was made to discharge the salvors' lien, not to preserve it. They did, indeed, act in the general interest, and for the benefit of all parties, but only in the same sense as the master acted in the general interest. It was for the interest of vessel and cargo alike that the claim of salvage should be settled without litigation, and without the detention and delays incident to the arrest of the ship and cargo. The vessel was a foreign one, belonging in Nova Scotia. J. F. Whitney & Co. were her consignees and agents. All the papers in the case, the receipt taken on paying the wrecking company, and the bond taken from the cargo owners, as well as the testimony, show that they acted expressly as "agents of the ship and owners," and on the master's direction. Their acts were legally the acts of their principals, the owners of the vessel. The insurers also specially insisted that Whitney & Co. had no authority to pay in their behalf. For their advances upon the master's order to pay the whole salvage, they had a claim and right of action against the owners, whether the cargo paid its share or not; but they had no lien on the ship, as against their principals. *The Esteban*, 31 Fed. Rep. 920; *White*

v. *Americus,* 19 Fed. Rep. 848; *The Raleigh,* 32 Fed. Rep. 633. The bond taken was properly enough taken in their own names, as agents of the owners, because they had advanced the money as such agents. Their taking such a bond from the cargo owners is wholly inconsistent with the theory that in advancing the money they acted at all as the agents of the latter. They plainly acted as agents of the ship and owners only. The latter were the principals. They, and not Whitney & Co., held a lien on the cargo until its delivery. Had Whitney & Co. paid as agents of the cargo owners, neither the ship nor her owners could have held any lien thereafter on the cargo, nor have refused immediate delivery, even without any bond; and any bond given must have been given to Whitney & Co. individually, and simply for their personal reimbursement. But the bond, on the contrary, is given to them as "owners or agents of the vessel." In any suit therefor, brought upon the bond, whether in the names of the agents or of the principals, precisely the same defenses, such as negligence of the ship, could be interposed.

No reasons are suggested why the rule as to voluntary payments should not be applied to maritime transactions as much as in other cases. The reasons in favor of this rule as respects actions *in rem* are even stronger than in ordinary cases; for implied liens are not favored, except in so far as they stand upon the grounds of commercial convenience or necessity, which cannot be pleaded in favor of actions like these. To recognize an implied lien for the repayment of moneys voluntarily paid would tend to the prejudice and insecurity of subsequent *bona fide* purchasers and incumbrancers; since such a lien, if sustained at all, would exist for a reasonable time to enforce it. These risks ought not to be increased or multiplied except upon strict necessity. In this very case, the charterer, after these payments, took the ship into possession, put her up as a general ship, and received a large amount of cargo, before notice of these demands. Were the vessel to be held, and her owners prove irresponsible, the result would be a heavy loss inflicted on the charterer for the benefit of those who had voluntarily paid a demand without raising objections, which, upon their present contention, constituted a known defense. The claims now made come too late. The libels must be dismissed, with costs.